The EARLY & DANIEL COMPANY, a Corporation Created and Existing under the Laws of the State of Ohio, Plaintiff,

v.

WEDGEFIELD, Inc., a Corporation Created and Existing under the Laws of the State of North Carolina, Defendant.

Civ. A. C–152–G–57.

United States District Court
M. D. North Carolina,
Greensboro Division.
Aug. 15, 1958.

"nicarbazin" which was highly destructive to the layability of its flock of 16,-500 chickens, rather than an ingredient known as "wormal", a poultry medication for laying chickens, as had been specified by the defendant. The defendant has filed a counterclaim against plaintiff for $250,000 damages, claiming that when said mash was fed to its chickens the nicarbazin in the mash caused a decrease in the production of eggs to a negligible number in quantity and that the quality of such eggs as were produced rendered them worthless, and that the nicarbazin in the mash so permanently damaged both the layability and the health of its flock that their slaughter was necessary.

The plaintiff, in its reply to the counterclaim, denies that the nicarbazin contained in the mash was in such quantity as to be highly dangerous and permanently destructive to the layability of defendant's laying flock. As a defense, the plaintiff pleads that the defendant negligently slaughtered its flock of chickens and sold it for meat for human consumption without investigating the cause of the condition of its flock and before it could be ascertained that the nicarbazin in the feed was at fault, and that if the defendant, instead of hastily slaughtering its flock, had waited until it was ascertained that nicarbazin was at fault, defendant would have known that the nicarbazin in the mash was not lethal and was only in sufficient quantity to affect temporarily the layability of defendant's flock of chickens, and that it was wholly unnecessary for the flock to be slaughtered. As a further defense to the counterclaim, plaintiff pleads that defendant is estopped to assert any claim that its flock was permanently damaged because defendant while itself in ignorance of the cause or causes of the condition of its flock, and without ascertaining any of the true facts thereto, voluntarily killed its flock of chickens, and by so doing rendered impossible the improvement, recovery or restoration of the flock to a normal condition that would otherwise have occurred.

C. R. Wharton and Richard L. Wharton, Greensboro, N. C., for plaintiff.

Beverly C. Moore, Greensboro, N. C., James B. Moore, Georgetown, S. C., and G. M. Howe, Jr., Charleston, S. C., for defendant.

STANLEY, District Judge.

This is an action brought by the plaintiff to recover $18,968.59 of the defendant for merchandise sold and delivered. The defendant admits owing said amount, less $384.33, the price of 140 fifty-pound bags of laying mash sold by plaintiff to defendant on March 29, 1957. Defendant claims that this laying mash contained an anticoccidial agent called

416

The defendant has timely moved under 28 U.S.C.A. § 1404(a)[1] for an order transferring the action to the district court for the Eastern District of South Carolina, Charleston Division, where it might have been brought, on the ground that the convenience of the parties and witnesses, and the interest of justice, will be promoted by such transfer.

From the pleadings, and from the affidavits filed in support of and in opposition to the motion to transfer, it appears that the plaintiff is a corporation created and existing under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio; that the defendant is a corporation created and existing under the laws of the State of North Carolina, but is domesticated in South Carolina and maintains its only office and transacts all of its business in or near Georgetown, within the Eastern District of South Carolina; that the plaintiff maintains an office and manufacturing plant at Sumter, within the Eastern District of South Carolina; that neither the plaintiff nor the defendant maintains an office or transacts any business whatever in the State of North Carolina; that the place of all the occurrences referred to in the pleadings is exclusively within the State of South Carolina; that the laying mash referred to in the pleadings was manufactured and sold by the plaintiff to the defendant in South Carolina, and the defendant fed the mash to its poultry flock in South Carolina; and that the only relationship North Carolina has to the controversy is the fact that the defendant is a North Carolina corporation.

It further appears that Sumter, South Carolina, where the plaintiff maintains a manufacturing plant, and where the mash in question was mixed, is about 75 miles from Charleston, whereas it is about 170 miles from Greensboro; that Georgetown, South Carolina, where the defendant transacts all of its business, and where the poultry flock in question was located, is about 60 miles from Charleston, whereas it is about 230 miles from Greensboro; that Charleston and Greensboro are about 255 miles apart; that Columbia, South Carolina, where some of the witnesses live, is about 180 miles from Greensboro and 110 miles from Charleston.

Since the indebtedness referred to in the complaint is admitted by the defendant, except $384.33 representing the purchase price of the allegedly contaminated laying mash, and since the plaintiff concedes that it inadvertently substituted a quantity of nicarbazin for wormal in the mash in question, the real controversy centers around the amount of nicarbazin in the mash, the temporary and permanent effect the feeding of the mash had on the defendant's laying flock, and the alleged negligence of the defendant in hastily slaughtering its flock.

The defendant has filed affidavits listing a number of witnesses which it claims are essential to the proof of its counterclaim. These witnesses include (1) a salesman and a number of unskilled employees of the plaintiff who live in or near Sumter, South Carolina, who will be expected to testify as to the manner of mixing the feed in question, (2) two officers and six employees of the defendant corporation, all residents of Georgetown, South Carolina, who are expected to testify with respect to the receipt of the feed in question, the feeding thereof, the resulting damage to the layability and physical condition of the flock, as well as the condition and good health of the flock prior to the feeding of the mash, (3) two employees of the Colonial Supermarket at Columbia, South Carolina, who are expected to testify as to the condition of the defendant's flock and the subsequent slaughter and sale of the flock to Colonial Stores, (4) two expert witnesses from Columbia, South Carolina, who are expected to testify as to the condition of the flock by reason of the laying mash having been

1. "(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

fed to them and the result of a chemical analysis made of the mash, (5) an expert witness from Atlanta, Georgia, who is expected to testify as to the result of the chemical analysis made of the mash and (6) two doctors of veterinary medicine from the State of Iowa, one of whom made a chemical analysis of the feed in question. The other witness is alleged to have visited the defendant's poultry farm immediately after the feeding of the mash in question and to have performed a number of necropsies on the affected chickens.

The plaintiff's list of witnesses, which it claims are essential to the defense of the counterclaim, includes (1) three officials of the plaintiff corporation, one of whom resides in the State of Indiana and the others in the State of Ohio, (2) three chemists from the State of New Jersey who are expected to testify with respect to an analysis made of the mash in question and the effect of nicarbazin on the layability of the hens and what constitutes a lethal dosage, (3) one witness from the State of Tennessee who is expected to testify as to the value of the defendant's flock at the time it was slaughtered, (4) a witness from the State of Kentucky who is expected to testify as to the value of defendant's flock at the time it was slaughtered and (5) one or more of plaintiff's employees of Sumter, South Carolina, who are expected to testify concerning the shipment of the samples of mash in question to laboratories in New Jersey.

Broadly speaking, all the witnesses may generally be characterized as either (a) officials of the plaintiff and defendant corporations, (b) expert witnesses who either made an analysis of the mash or can testify as to the effect of nicarbazin on the layability of hens, and (c) witnesses who were familiar with the condition of the flock before the mash was fed, and who fed the mash and thereafter observed the condition of the flock.

The plaintiff contends that the testimony of a number of the defendant's witnesses would be irrelevant and immaterial due to the fact that the introduction of a quantity of nicarbazin into the feed has been admitted, that there is no real dispute as to the condition of the defendant's flock before the mash was fed, and that the temporary and lasting effects of the nicarbazin are matters to be determined by expert witnesses. This reasoning was persuasive until it developed at the time of oral arguments that there is a serious dispute between the parties as to the amount of nicarbazin that was actually contained in the mash. Various chemists obtained different results when the feed was analyzed. This was explained by the fact that the feed containing nicarbazin was placed in troughs with other feeds and that the various samples analyzed had been diluted with feed which did not contain nicarbazin. Under these circumstances, it would appear that the employees of the defendant corporation who actually packed and shipped the samples to various laboratories for testing, and employees who have knowledge of the mixing of the feed containing nicarbazin with other feed, would be very material. As one of its principal defenses to the counterclaim, the plaintiff contends that sufficient nicarbazin had not been introduced into the feed to make it lethal or to permanently affect the layability of the defendant's flock, and that the defendant was negligent in hastily slaughtering its flock. Under these circumstances, it would appear that one of the real issues to be determined is the quantity of nicarbazin contained in the mash. This issue must be settled before the experts can testify as to its temporary and permanent effect on the defendant's flock. The defendant contends that it will require the testimony of at least seven witnesses, all living in the area of Georgetown, to establish these essential facts.

The principal contention of the defendant is that the trial in Greensboro will make access to sources of proof more difficult and make it impossible for the defendant to avail itself of compulsory process for the attendance of unwilling

witnesses and make it oppressively costly to transport willing witnesses to the court. The point is also made that the trial in Greensboro will render it impossible for the court and jury to view the premises where the defendant's poultry farm and egg producing business is located. The plaintiff contends that it would be much more convenient for its witnesses, most of whom live in northern and western states, to come to Greensboro, which is approximately 280 miles nearer their residence than Charleston, and that Greensboro is more accessible by highway, railroad and air. The plaintiff has also filed letters from some of defendant's expert witnesses expressing a preference for Greensboro.

Prior to the revision of the Judicial Code in 1948, it was necessary to apply the doctrine of *forum non conveniens*. The harsh result of the application of that doctrine was dismissal of the action. Change of venue is a far less drastic measure than is dismissal. As is set out in many of the leading cases, dismissal often resulted in leaving a plaintiff without a remedy because of the running of the statute of limitations. No such harsh result comes from change of venue.

■ There seems to be little question but that Congress, by the enactment of 28 U.S.C.A. § 1404(a), intended to permit courts to grant transfers upon a lesser showing of inconvenience. In Jiffy Lubricator Co. v. Stewart-Warner Corporation, 4 Cir., 1949, 177 F.2d 360, 362, one of the earlier cases in this circuit dealing with the transfer of cases under this section, the late Chief Judge Parker, in referring to the distinction between 28 U.S.C.A. § 1404(a) and the old law relating to *forum non conveniens*, had this to say:

"The notion that 28 U.S.C.A. § 1404(a) was a mere codification of existing law relating to forum non conveniens is erroneous. It is perfectly clear that the purpose of this section of the Revised Judicial Code was to grant broadly the power of transfer for the convenience of par-

ties and witnesses, in the interest of justice, whether dismissal under the doctrine of forum non conveniens would have been appropriate or not."

This construction of the statute was specifically approved by the United States Supreme Court in Norwood v. Kirkpatrick, 1955, 349 U.S. 29, 75 S.Ct. 544, 99 L.Ed. 789.

■ The plaintiff makes the point that it would be fairer to all concerned to have the litigation settled in a neutral forum rather than a forum where one of the parties transacts its principal business. I do not think, however, that this is a consideration that should be seriously considered. As is set out in Carbide & Carbon Chemicals Corp. v. United States Industrial Chemicals, Inc., 4 Cir., 140 F.2d 47, 49, the courts of one district "must be presumed to be as able and as well qualified to handle litigation as those in another." Further, it should be borne in mind that both the plaintiff and the defendant operate business establishments in the Eastern District of South Carolina, the plaintiff's establishment being about 75 miles from Charleston and the defendant's establishment being about 60 miles from Charleston.

■ While due weight must be given to plaintiff's choice of forum, and to entitle a party to transfer his reasons should be fairly substantial, it seems that, in the final analysis, each case must stand on its own facts, weighed against the background of the statute. This seems to be the sound and practical rule given by Judge Warlick in Clayton v. Swift & Company, D.C.W.D.N.C.1956, 137 F.Supp. 219. Further, the authorities seem to hold that the convenience of expert witnesses is entitled to little or no consideration. Nocona Leather Goods Co. v. A. G. Spalding & Bros., Inc., D.C. D.Del.1958, 159 F.Supp. 269.

In the case of Southern Railway Company v. Madden, 4 Cir., 1956, 235 F.2d 198, where the considerations favoring removal were but slightly stronger than the considerations favoring the defend-

ant in this case, it was held that the refusal to transfer under 28 U.S.C.A. § 1404(a) was not a sound exercise of discretion.

 After carefully considering the facts in this case, and according due consideration to such factors as the weight to be attached to the plaintiff's choice of forum, the access to sources of proof, the weight to be given to the convenience of expert witnesses, and other relevant factors, it seems to me that clearly this controversy can be more appropriately and conveniently settled in Charleston than in Greensboro.

Counsel will submit an order transferring this case to the Eastern District of South Carolina, Charleston Division.